# UNITED STATES DISTRICT COURT
for the
Eastern District of North Carolina

**FILED**
DEC 1 6 2015
JULIE RICHARDS JOHNSTON, CLERK
US DISTRICT COURT, EDNC
BY \_\_\_BLH\_\_\_ DEP CLK

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No. 5:15-MJ-2282-JG
In the Matter of the Use of a Cell Site Simulator to Locate )
the Cellular Device Assigned Call Number )
910-850-4060 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the \_\_\_Eastern\_\_\_ District of \_\_\_North Carolina\_\_\_, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☐ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distrib. and Poss. with Intent to Distrib. Cocaine and Cocaine Base |
| 21 U.S.C. § 841(a)(1) | Distribution and Possession with Intent to Distribute Cocaine and Cocaine Base |

The application is based on these facts:
See attached affidavit. To ensure technical compliance with the Pen Register Statute, 18 U.S.C. §§ 3121-3127, this warrant also functions as a pen register order. Consistent with teh requirement for an application for a pen register order, I certify that the information likely to be obtained is relevant to the ongoing investigation by the FBI.

☐ Continued on the attached sheet.

☒ Delayed notice of  30  days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

FBI TFO *[signature]*
*Applicant's signature*

On this day, **Justin Matthews** appeared before me via reliable electronic means, was placed under oath, and attested to the contents of this Application for a Search Warrant.

Task Force Officer Justin Matthews, FBI
*Printed name and title*

Date: **16 December 2015**

*[signature]*
*Judge's signature*

City and state: Raleigh, North Carolina

Hon. James E. Gates, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

IN THE MATTER OF THE USE OF A
CELL SITE SIMULATOR TO LOCATE
THE CELLULAR DEVICE ASSIGNED
CALL NUMBER (910) 850-4060

Case No. _____

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT**

I, Task Force Officer Justin Matthews, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique, which is described in Attachment B, to determine the location of the cellular device assigned call number (910) 850-4060 (the "Target Cellular Device"), which is described in Attachment A.

2. I am a Task Force Officer with the Federal Bureau of Investigation (FBI) and have been since November 9, 2015, and I have also been a Detective with the Fayetteville Police Department since July of 2009. I attended basic law enforcement training at the City of Fayetteville Police Academy. During the academy I completed over seven hundred and fifty hours of training from certified police instructors. In January of 2011, I completed forty hours of counter drug physical surveillance classes and received a certificate from the Mid-Atlantic Narcotic Training Academy. In November of 2012, I attended Johnston Community College's Rural Surveillance Course where I received 40 hours of training on how to gather intelligence on Drug Traffickers through rural surveillance. I am an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in

Title 18 and 21 of the United States Code. As a Detective with the Fayetteville Police Department, I have prepared or written numerous search and seizure warrants for drug and weapons violations and have made or participated in numerous arrests of persons who have violated these laws of the State of North Carolina. I have received training and have field experience in the operations of street-level drug investigations. I have developed, obtained information from, and used confidential sources of information during the investigation of street-level drug sales. I have participated in numerous investigations that have utilized cell site location as an investigative tool.

3. Through my training and prior experience your affiant is also familiar with the use of cellular telephones and the Internet by drug traffickers to facilitate their illegal acts, and the use of numerical codes and code words to conduct drug transactions. Based on this familiarization, I know the following:

a) Cellular telephones are an indispensable tool of the drug trafficking trade. Narcotics traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators and narcotics traffickers. In addition, narcotics traffickers will often change their cellphones following the arrest of a member of their DTO, or at random in order to frustrate law enforcement efforts;

b) Narcotics traffickers often place nominal control and ownership of telephones in names other than their own to avoid detection of those telephones by government agencies. Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them;

c) Narcotics traffickers utilize different types of communication devices, and change the numbers to these communication devices frequently. This is done to avoid detection by law enforcement personnel. I also know that narcotics traffickers will dedicate different communication devices for different aspects of the trafficking organization. An example of this would be a narcotics trafficker utilizing one cellular telephone to communicate with customers, and utilizing another cellular telephone to communicate with a source of supply of narcotics;

4. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for a search warrant, your affiant has not included every detail of every aspect of the investigation. Rather, your affiant has set forth only those facts believed to be necessary to establish probable cause. Your affiant has not, however, excluded any known information that would defeat a determination of probable cause. The information contained in this Affidavit is based upon my personal knowledge, review of documents and other evidence, and conversations with other law enforcement officers and other individuals. All conversations and statements described in this Affidavit are related in substance and in part unless otherwise indicated. Summaries and descriptions, including quotations, of recorded conversations are based on a review of audio recordings and draft transcripts thereof. In some instances, as indicated below, specific quotations are based on information obtained from confidential sources who participated in the conversations.

5. One purpose of applying for this warrant is to determine with precision the Target Cellular Device's location. However, there is reason to believe the Target Cellular Device is currently located somewhere within this district because Wayne WHITTED has regularly been observed at locations in this district, including 1124A Pamalee Drive, Fayetteville, NC. Pursuant

to Rule 41(b)(2), law enforcement may locate the Target Cellular Device outside the district provided the device is within the district when the warrant is issued.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846 and 841(a)(1) have been committed, are being committed, and will be committed by Wayne WHITTED and others. There is also probable cause to believe that the location of the Target Cellular Device will constitute evidence of those criminal violations, including leading to the identification of individuals who are engaged in the commission of these offenses and identifying locations where the target engages in criminal activity.

7. Additionally, Wayne WHITTED was charged with these crimes on December 15, 2015 and is the subject of an arrest warrant issued on December 15, 2015. There is also probable cause to believe that the Target Cellular Device's location will assist law enforcement in arresting Wayne WHITTED, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

8. Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41. See 18 U.S.C. §§ 3121-3127. This warrant therefore includes all the information required to be included in a pen register order. See 18 U.S.C. § 3123(b)(1).

## PROBABLE CAUSE

A. **BACKGROUND**

9. The FBI and Fayetteville Police Department ("FPD") are conducting an investigation of the WHITTED DTO. The investigation, which continues to date, has involved,



among other things, the use of confidential sources of information, controlled purchases of narcotics, audio and video recording, and physical surveillance.

10. Based on evidence gathered to date, I believe that several DTO members are distributing cocaine (suspected cocaine base) from locations in Fayetteville. Additionally, I believe that Genesis WHITTED frequently carries and uses firearms during drug deals.

## B. INVESTIGATION

11. Two confidential sources of information (CSI 1 and CSI 2) have informed agents that WHITTED is engaged in a conspiracy to distribute and possess with intent to distribute cocaine and cocaine base.

12. Information received from the CSIs has been corroborated through law enforcement records, business records obtained through subpoena or court order, physical surveillance, additional witness statements, and undercover purchases. Furthermore, based upon information known to controlling agents, the CSIs have never provided any false or misleading information.

13. Specifically, on October 28, 2015 the Affiant was contacted by CSI 1, a cooperating witness with the Fayetteville Police Department. CSI 1 stated that WHITTED is the leader of a violent DTO involved in the distribution of cocaine.

14. Through information provided by the CSI and independent investigation, the Fayetteville Police Department also identified Wayne Desmond WHITTED, Brandon Bernard BOWMAN (a/k/a DC), Bobby Deshawn BAILEY, Joel Michael McLAURIN, Jr., and Carter Demetrius SHARP as members of WHITTED's DTO. According to CSI 1, WHITTED and his

DTO have a reputation for committing robberies of rival drug traffickers. CSI 1 also stated that WHITTED and members of his DTO frequently use firearms during those robberies.

### November 9, 2015 Controlled Purchase

15. On November 9, 2015, the Affiant spoke with CSI 1 in reference to suspect Genesis WHITTED. CSI 1 stated Genesis WHITTED provided CSI 1 with the cell phone number 910-703-3737 so that CSI 1 could coordinate a purchase of cocaine base from Genesis WHITTED. CSI 1 provided other information about Genesis WHITTED that was later corroborated by agents, including information that Genesis WHITTED was operating a dark color Dodge Magnum with a 30-day temporary registration plate.

16. On November 9, 2015 the Affiant met with CSI 1 to conduct a controlled purchase of cocaine base from suspect Genesis WHITTED. CSI 1 placed a phone call to 910-703-3737, which had been provided to CSI 1 by Genesis WHITTED. The Affiant recorded audio of the phone conversation. The Affiant overheard CSI 1 speak with a person who the Affiant recognized to be Genesis WHITTED. CSI 1 arranged to purchase a quarter ounce (seven grams) of cocaine base from Genesis WHITTED. Genesis WHITTED arranged to meet with CSI 1 in the parking lot of the BP Gas Station located at the corner of Pamalee Drive and Blanton Road in Fayetteville, North Carolina.

17. The Affiant conducted a search of CSI 1 for any contraband to include drugs, money, or weapons, and none were located. The Affiant provided CSI 1 with an amount of Fayetteville City Confidential Funds and an audio/video recording device. The Affiant escorted CSI 1 to the BP Gas Station. The Affiant observed CSI 1 enter the rear seat of a gray in color Dodge Magnum displaying a 30 day registration plate. The Magnum traveled to the area of Tryon Drive and parked. Within minutes the vehicle returned to the BP Gas Station.

18. CSI 1 exited the Dodge Magnum and returned to the Affiant with a plastic bag containing 7.2 grams of suspected cocaine base that was purchased from Genesis WHITTED.

19. On November 10, 2015, the Affiant conducted surveillance in the area of Pamalee Drive I Blanton Road. The Affiant observed and gained video footage of Genesis WHITTED operating the same gray Dodge Magnum bearing a 30-day registration plate.

20. On November 10, 2015, members of the Fayetteville Police Department's Patrol division conducted a traffic stop on the gray Dodge Magnum bearing 30-day registration plates for a window tint violation. The driver of the vehicle was found to be Genesis WHITTED. Genesis WHITTED is also the registered owner of the vehicle. A probable cause search was conducted on the vehicle and Officers located two black in color ski masks in the rear cargo area. Based on my training and experience, I believe that these types of ski mask are used by WHITTED's organization to conduct robberies of rival drug traffickers.

21. The substance was later tested by a lab and confirmed to be 6.82 grams of cocaine; a test for cocaine base is pending.

### November 13, 2015 Controlled Purchase

22. On November 13, 2015, the CSI met with the Affiant and placed a phone call to Genesis WHITTED at 910-703-3737 to arrange another purchase. The phone number was disconnected. The CSI then sent a Facebook message to the account "Still Standing," which the CSI stated was used by Genesis WHITTED. Shortly afterwards, the CSI informed the Affiant that Genesis WHITTED had just called and provided a new telephone number for future cocaine transactions: 910-635-4891.

23. At 1220 hours on November 13, 2015, the CSI placed a controlled phone call to Genesis WHITTED, who was using 910-635-4891. Genesis WHITTED instructed the CSI to go

to "Newman's," a restaurant in Fayetteville. Genesis WHITTED then asked the CSI if he wanted a "quail." Based on my training and experience, I know that a "quail" is slang for seven grams of cocaine base. The CSI was searched for money and contraband, with negative results. As the CSI began traveling to "Newman's," Genesis WHITTED called the CSI and instructed him to go to a residence at 2003 Newark Avenue, Fayetteville. Detectives conducting surveillance saw the CSI arrive at the residence and briefly speak with an individual in a Ford Truck; the CSI later informed agents that Genesis WHITTED was in the truck and directed the CSI to go into the residence and meet with "Knowledge." The CSI entered the residence, exited soon afterwards, and returned to the Affiant with two bags of suspected crack cocaine.

24. The substance was later tested by a lab and confirmed to be 6.33 grams (gross) of cocaine; a test for cocaine base is pending.

### November 16, 2015 Controlled Purchase

25. On November 16, 2015, the CSI placed a controlled phone call to Genesis WHITTED. The CSI ordered a "quail"; as stated above, based on my training and experience, I know that "quail" is a slang term meaning seven grams of cocaine base. Genesis WHITTED instructed the CSI to go to the Blanton Road BP Gas Station in Fayetteville, North Carolina. The CSI was searched for money and contraband, with negative results. Your Affiant observed the CSI travel to the BP Gas Station. The CSI then informed your Affiant that Genesis WHITTED had instructed him/her to go across the street to the car wash across the street. The CSI traveled to LLB Car Wash located at 1124A Pamalee Drive, Fayetteville, North Carolina, which I know to be a car wash used by Genesis WHITTED and his co-conspirators. I observed the CSI meet with Genesis WHITTED and Wayne WHITTED in front of the car wash's garage bays. A few minutes later, the CSI walked into the garage bay and exited again. Genesis WHITTED then

walked into the garage where the CSI had just exited. Wayne WHITTED then handed something to Genesis WHITTED, and Genesis WHITTED threw an object onto the ground beside the CSI. The CSI retrieved the item and returned to your Affiant.

26. The object was a bag containing suspected cocaine base. The substance was later tested by a lab and confirmed to be 5.72 grams of cocaine; a test for cocaine base is pending.

27. The CSI was interviewed and he explained that Genesis had instructed the CSI to place money for the drugs inside the garage bay, which the CSI did, and Genesis WHITTED then threw the bag to the ground by the CSI.

### November 18, 2015 Controlled Purchase

28. On November 18, 2015, CSI 1 placed a recorded phone call to Genesis WHITTED and ordered a "quail" and an "eight"; based on my training and experience, I know that "quail" is a slang term referring to seven grams of cocaine base and "eight" is a slang term referring to 3.5 grams of cocaine base, WHITTED instructed CSI 1 to go to the car wash. At 1257 hours, officers observed CSI 1 arrive at the car wash, and WHITTED got into the car. WHITTED and CSI 1 then switched positions so that WHITTED was driving.

29. The vehicle traveled to 2003 Newark Avenue, which agents have determined is the residence of Joel McLAURIN a/k/a "Knowledge." The vehicle returned to the car wash at 1323 hours. CSI 1 returned to your Affiant and handed me an off-white bag of rock-like material.

30. CSI 1 was interviewed. He said that WHITTED got in and then said that he (WHITTED) would drive, so they switched seats. WHITTED then began talked about how he always kept a small gun on him, and WHITTED pulled a small chrome handgun from his pocket. WHITTED then advised CSI 1 that he (CSI 1) should keep a gun like WHITTED's. WHITTED

said the gun was similar to the gun that killed "Murk Meezy," and Genesis referred to the gun as a "pocket rocket." Genesis then waved the gun around in the car.

31. CSI 1 then said that at 2003 Newark, WHITTED walked inside and then walked out with McLAURIN a/k/a "Knowledge." WHITTED then handed a bag of suspected cocaine base to CSI 1.

32. Officers later reviewed an audio and video recording that was taken by a device held by CSI 1 during the transaction. The video briefly shows the tip of the firearm as WHITTED waved it around. The audio captured WHITTED saying, "there's a quail right there" as he handed the suspected narcotics to CSI 1.

33. The substance was tested and confirmed to be 6.26 grams of cocaine. A test for cocaine base is pending.

### November 24, 2015 Controlled Purchase

34. CSI 1 made a controlled phone call to Genesis WHITTED. CSI 1 arranged to purchase 3.5 grams of cocaine base. WHITTED directed CSI 1 to "Round the Clock Towing" on Bragg Boulevard in Fayetteville.

35. Agents observed WHITTED's Dodge Magnum parked at the location. CSI 1 walked up to it and returned to your Affiant with a bag of off-white, rocklike material.

36. CSI 1 was interviewed. He stated that during the transaction, Genesis WHITTED was in the driver's seat of the Dodge Magnum with approximately four ounces of suspected cocaine base in his lap. CSI 1 also said that Wayne WHITTED was standing next to the vehicle during the transaction. Finally, CSI 1 said that he handed money to Genesis WHITTED, and Genesis WHITTED handed suspected cocaine base to CSI 1.

37. The substance was tested and confirmed to be 3.41 grams of cocaine. A test for cocaine base is pending.

### November 30 to December 3, 2015 Controlled Purchase

38. CSI 1 advised your Affiant that Genesis WHITTED was willing to "front" one ounce of cocaine base to CSI 1, and that WHITTED directed CSI 1 to meet him at Bronco Square in Fayetteville.

39. CSI 1 made a controlled phone call to WHITTED, and WHITTED confirmed he would be there.

40. Agents saw the Dodge Magnum in front of "Trimmerz" barbershop in Bronco Square. Agents then saw WHITTED exit Trimmerz and get into the driver seat of the Dodge Magnum. CSI 1 got into the rear driver-side seat. CSI 1 then returned to your Affiant with a bag of off-white, rock-like material.

41. CSI 1 was interviewed. He said that he got into the Dodge Magnum, and Genesis WHITTED was in the driver's seat and an individual named "Perry" (later identified as Perry Sykes) was in the passenger's seat. CSI 1 said he handed digital scales to WHITTED; the scales had been requested by WHITTED and provided by your Affiant for the purpose of the controlled purchase. WHITTED then said "here is fourteen," and handed suspected cocaine base to CSI 1.

42. The substance was later tested and confirmed to be 12.79 grams of cocaine. Tests for cocaine base are pending.

43. On December 2, CSI 1 said that Genesis WHITTED had called asking about the money that CSI 1 owed for the narcotics that were fronted on November 30. CSI 1 placed a controlled call to WHITTED, and he directed CSI 1 to the car wash. Officers provided CSI 1

with $400 in controlled funds; CSI 1 was then observed going to the car wash. CSI 1 walked up to the Dodge Magnum and got inside, and CSI 1 then returned to the agents.

44. CSI 1 was interviewed. He said that Genesis WHITTED was the only person in the car, and that WHITTED had a Glock firearm on the center console.

45. One December 3, CSI 1 made a controlled phone call to WHITTED stating that he had the remaining money for the fronted drugs, and WHITTED directed CSI 1 to go to the car wash. CSI 1 was observed meeting with a man whom agents recognized as Perry Sykes. CSI 1 handed the money to Sykes. Soon afterwards, WHITTED was seen driving up to the car wash and meeting with Sykes, presumably to pick up the money.

### Subject Telephone

46. On December 4, 2015 I obtained a Federal Search Warrant for a Verizon Cell Phone Account 910-703-3737 that was being used by Genesis WHITTED to orchestrate drug transactions.

47. On December 9, 2015, in response to that warrant, I received a prepared report from Verizon Wireless that included phone numbers that the target phone number was calling or numbers that were calling the target phone. I ran the report through the Fayetteville Police Department's Pen Link software system to compare the phone numbers to other cell phone reports received from Drug Investigations conducted by the Fayetteville Police Departments Narcotics Unit.

48. I was able to identify a cell phone assigned call number 910-850-4060 (the Target Telephone) that was in contact with the WHITTED's telephone number (910-703-3737) ten times during a one-month time span. Pen Link determined that 910-850-4060 (the Target Telephone) has previously been identified as being used by Wayne Desmond WHITTED.

49. I have used the Fayetteville Police Departments Pen Link system in the past to identify other drug traffickers phone numbers and have found this to be an accurate method of identifying the users of telephone numbers.

50. Another investigator has informed me that Pen Link associated Wayne WHITTED with the Target Telephone because in March of 2013, the Fayetteville Police Department conducted a traffic stop of Genesis WHITTED and Wayne WHITTED. Wayne WHITTED was found to be in possession of a telephone assigned call number (910) 850-4060 (the Target Telephone).

### Indictment

51. On December 15, 2015, the grand jury for the Eastern District of North Carolina issued a sealed indictment against Genesis WHITTED, Wayne WHITTED, and Joel Michael McLAURIN. That indictment charges all three individuals with conspiring to distribute and possess with intent to distribute a quantity of cocaine in violation of 21 U.S.C. § 846, among other charges. Federal arrest warrants were issued against all three individuals. Agents do not currently know where Wayne WHITTED lives, and so the prospective phone location information will assist officers in executing the federal arrest warrant against him.

### MANNER OF EXECUTION

52. In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

53. To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the Target Cellular Device or receiving signals from nearby cellular devices, including the Target Cellular Device. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the Target Cellular Device and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the Target Cellular Device and use that information to determine the Target Cellular Device's location, even if it is located inside a house, apartment, or other building.

54. The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Device, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the Target Cellular Device, and law enforcement will limit collection of information from devices other than the Target Cellular Device. To the extent that any information from a cellular device other than the Target Cellular Device is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Device from all other cellular devices.

## AUTHORIZATION REQUEST

46. Based on the foregoing, your Affiant requests that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41. The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

55. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days from the end of the period of authorized surveillance. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cellular Device would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and [continue to] flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2). I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cellular Device outside of daytime hours.

56. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cellular Device outside of daytime hours.

57. A search warrant may not be legally necessary to compel the investigative technique described herein. Nevertheless, I hereby submit this warrant application out of an abundance of caution.

Respectfully submitted,

_FBI TFO [signature]_
Justin Matthews
Task Force Officer
Federal Bureau of Investigation

On this 16 day of DECEMBER 2015, JUSTIN MATTHEWS appeared before me via reliable electronic means, was placed under oath, and attested to the contents of this Affidavit.

[signature]
James E. Gates
United States Magistrate Judge

## ATTACHMENT A

This warrant authorizes the use of the electronic investigative technique described in Attachment B to identify the location of the cellular device assigned phone number (910) 850-4060, whose wireless provider is Cellco Partnership d/b/a Verizon Wireless.



# ATTACHMENT B

Pursuant to an investigation of Wayne WHITTED and others for violations of 21 U.S.C. §§ 846 and 841(a)(1), this Warrant authorizes the officers to whom it is directed to determine the location of the cellular device identified in Attachment A by collecting and examining:

1. radio signals emitted by the target cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and
2. radio signals emitted by the target cellular device in response to radio signals sent to the cellular device by the officers;

for a period of thirty days, during all times of day and night. This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).